Annenberg, Appellant, *v.* Roberts et al.

Annenberg, Appellant, *v.* Thompson et al.

Annenberg, Appellant, *v.* Thompson et al.

204

Argued November 10, 1938.  Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Wm. A. Schnader,* with him *John H. Fertig* and *Wm. A. Gray,* for appellants.

*Lemuel B. Schofield,* for appellees.

PER CURIAM, November 25, 1938:

On July 22, 1938, the Governor of the Commonwealth issued a proclamation convening the General Assembly to meet in special session on July 25, 1938, "to consider legislation and appropriate action" upon twenty-four specified subjects, of which the fifteenth was as follows: "Making illegal the use of devices or methods of transmission of information or advices in furtherance of gambling."

The legislature, which is now in session in pursuance of this call, passed an act (No. 27), signed by the Governor on October 11, 1938, [P. L. 77] entitled, "An Act creating a commission to study and report on use of devices and methods of transmission of information or advices in furtherance of gambling and making an appropriation." The preamble stated that it was essential that the General Assembly should "have a full disclosure of the facts pertaining to the use of machines or instruments and other devices that are used to furnish or obtain information to be used in gambling, before proper legislation may be enacted with respect thereto." The act provided for a commission to be composed of six persons, three of whom should be appointed by the President pro tempore of the Senate and three by the Speaker of the House of Representatives, and it was to be their duty "to make a careful and thorough investigation of the existing practices, means, machines, instruments and devices whereby information is knowingly gathered, obtained, disseminated and received in the furtherance of gambling, for the purpose of reporting to this extraordinary session of the General Assembly as early as possible its findings and its recommendations as to such changes or improvements as it may find to be necessary or desir-

able to correct any imperfections, insufficiencies or defects in existing laws relating to gambling, to the end that the gambling evil may be more readily and more completely eliminated." There followed a proviso that "if the commission is unable to complete its investigation during the current special session of the General Assembly it shall have power to sit and continue its investigations after the adjournment of the current special session, and it shall then make its report and recommendations to the Governor and to the next regular session of the General Assembly." The commission was given power to issue subpoenas "requiring and demanding any proper person or persons to appear before it and to answer such questions touching matters properly being inquired into by the commission and to produce such books, papers, records and documents relating to the subject of inquiry as the commission may deem necessary." Any person wilfully refusing to appear or testify before the commission or to produce any such books, papers, records or documents was to be "subject to the penalties provided by the laws of this Commonwealth in such cases."

Six persons, all members of the General Assembly, were appointed in accordance with the provisions of the act. But on October 18, 1938, plaintiff John M. Annenberg filed a bill in equity in the Court of Common Pleas of Dauphin County against the Auditor General, the State Treasurer, and the members of the commission, alleging that he was a taxpayer of the Commonwealth, and praying an injunction to restrain the expenditure of public funds pursuant to the appropriation made by the act, and to restrain the commission from taking further proceedings. The bill asserted that the act violated Article I, section 8, Article II, section 1, and Article III, sections 3 and 25, of the Constitution of Pennsylvania. The court granted a preliminary injunction, subject to a rule to show cause why it should not be continued. This injunction, later somewhat modified, was, after

hearing, dissolved on November 2, 1938. From that action of the court below plaintiff now appeals.

Where a preliminary injunction is granted subject to a motion to continue, and such motion is afterwards overruled and the injunction dissolved, the situation is treated on appeal as equivalent to the refusal of a preliminary injunction and the decree of dissolution as constituting an appealable order within the meaning of the Act of June 12, 1879, P. L. 177: *National Automobile Service Incorporation v. Barfod,* 288 Pa. 227. In such cases the appellate court will look only to see if there were any apparently reasonable grounds for the action of the court below, and will not express an opinion on the merits except where the record discloses a fundamental error of law: *Casinghead Gas Co. v. Osborn,* 269 Pa. 395; *Kaufman v. Philadelphia,* 293 Pa. 270; *Stim v. Bezinec,* 325 Pa. 492. Because of this one exception to the general rule, if the court below relied upon the authority of a statute which is plainly unconstitutional, and a decision to that effect will determine the case, the appellate court will reverse the order dissolving the injunction: *National Automobile Service Incorporation v. Barfod,* supra. It is upon this theory that plaintiff asks relief on the present appeal. We are not, however, convinced that there is merit in any of the objections urged by him to the constitutionality of the act as a whole.

An attack is made upon the title of the act. It refers to a commission which is to "study" the subject, whereas the act itself provides for an "investigation"; this difference in phraseology is too insignificant to warrant criticism. The title speaks of methods of "transmission" of information, whereas the investigation provided for in the body of the act covers "practices . . . whereby information is . . . gathered, obtained, disseminated and received"; these processes, joined together, are equivalent to, or embodied in, that of "transmission." The title confines itself to that phase of the gambling evil which is concerned with the use of devices and meth-

ods of transmission of information, whereas the act provides that the commission is to report its findings and recommendations for the correction of defects in the laws relating to gambling generally, without any such restriction; it is clear, however, that the limitation is implied, and that it was not the legislative intent that the subject covered by the report should be broader in scope than that which was studied or investigated by the commission. The power given the commission to compel witnesses to appear and to produce books and records is not referred to in the title, but it need not be, being merely incidental to the general purpose of the act. "A title need name only the real subject of the legislation; it need not set forth all enactments intended to be made in regard thereto. If the subject is designated with sufficient clearness to put one on inquiry into the body of the act, all necessary or appropriate details to carry out the purpose of the statute there found will be treated as within the title": *Commonwealth v. Snyder*, 279 Pa. 234, 242. All that is necessary is that the title of the act should be sufficient 'to put any one, having an interest in the subject-matter, on inquiry'": *Knowles's Estate*, 295 Pa. 571, 580.

The act is assailed on the ground that it is not within the scope of the legislation specified in the call for the special session, since there was no item in the Governor's proclamation which dealt with the creation of a commission to investigate gambling, as there was, for example, in regard to the oil industry. But the call did provide for *legislation* on that subject, and the inference necessarily arises that the special session could establish a committee or a commission to study and report so as to guide it in determining the advisability of such legislation and the terms thereof. "Although the subjects [specified in the Governor's proclamation] should be sufficient to evoke intelligent and responsive action from the legislature, it is not necessary that they include all the methods of accomplishment": *Commonwealth ex rel.*

*Schnader v. Liveright,* 308 Pa. 35, 57. There is, however, an important distinction that must be borne in mind between the express call for a commission, and the power to create one arising only inferentially from the Governor's invitation to legislate upon a specified subject. In the former case, the setting up of such a commission is an independent and primary subject of action by the special session, not necessarily connected with any legislation to be passed by it, while, in the latter case, the power to create the investigating commission being merely ancillary to that of the special session to legislate, the function of the commission ceases when the legislation, if not previously effected, becomes impossible by reason of the special session coming to an end. When the power to accomplish the primary object expires, so likewise does the implied power to utilize means for its accomplishment. It follows that, because of the inhibition contained in Article III, section 25, of the State Constitution, the clause of the act is clearly invalid which provides that if the commission is unable to complete its investigation during the current special session it shall have power to sit and continue its investigations after the adjournment of the special session and to report to the Governor and the next regular session of the General Assembly. This provision may, however, be eliminated without impairing the constitutionality of the remainder of the act.

Plaintiffs' next complaint is that the act involves an illegal delegation of legislative power in that it not only gives to a commission the right to investigate the facts upon which proposed legislation is to be based, but in furtherance of that object confers upon it the power to issue subpœnas and compel persons to appear before it and testify, and in this connection stress is laid upon the fact that the act does not even require the members of the commission to be members of the General Assembly. The significance of these objections is not apparent. Certainly committees or commissions may be created by

a legislative body to investigate subjects upon which legislation may properly be enacted, and neither the functioning of such a commission nor the grant to it of the right to issue subpœnas constitutes a delegation by the General Assembly of its power to make laws in violation of Article II, section 1, of the State Constitution. It has been an almost continuous practice of successive legislatures to create such commissions, composed in whole or in part of persons not members of the legislature, but, nevertheless, with the power to issue subpœnas for the attendance of witnesses and the production of books and papers. (See, for example, Joint Resolution, April 18, 1905, P. L. 205; Joint Resolution, March 24, 1911, P. L. 26; Joint Resolution, June 14, 1911, P. L. 918; Joint Resolution, June 27, 1913, P. L. 648; Joint Resolution, June 15, 1915, P. L. 974; Joint Resolution, July 25, 1917, P. L. 1198; Act of July 25, 1917, P. L. 1199; Act of May 14, 1925, P. L. 715; Act of May 14, 1925, P. L. 720; Joint Resolution, May 4, 1927, P. L. 753; Joint Resolution, May 4, 1927, P. L. 756; Joint Resolution, June 3, 1933, P. L. 1525.)*

Holding, as we do, that Act No. 27 is constitutional except as to the one clause which would permit the commission to function after the adjournment of the current special session of the General Assembly, it follows that the court below was right in dissolving the preliminary injunction which it had originally issued.

We come now to a consideration of bills in equity filed in these same proceedings by plaintiffs Moses L. Annenberg and Walter H. Annenberg respectively. The commission, having started to conduct hearings, issued subpœnas to these plaintiffs commanding them to produce "all records, including contracts, stock certificates, agreements of trust, agreements of partnership, ledgers, journals, check books, cancelled checks, bank deposit

---

* By this reference to the Joint Resolutions we do not mean to pass on the validity of any of these commissions.

books, passbooks, accounts, evidences of ownership, and memoranda, including letters, telegrams, messages and memoranda received from, and copies of letters telegrams, messages and memoranda sent to" thirty-eight named individuals, "showing your connection with or interest in, either directly or indirectly, any or all companies, holding companies, corporations, partnerships or associations, directly or indirectly, engaged in or having to do with the dissemination of sporting news in all forms and by any means, including horse racing results distributed in the State of Pennsylvania or elsewhere in the United States or Canada, newspapers, racing sheets, dope sheets, form sheets, racing records and statistics, and particularly with respect to the following corporations or companies," naming fifty-two corporations. The bills in equity of these plaintiffs seek to restrain the commission from proceeding under the act and to enjoin it from attempting to compel the production of the documents and records relating to the corporations designated in the subpœnas. Plaintiffs contend that the nature of the documents called for indicates that the real object of the commission is not to collect information for legislative purposes, but to investigate the personal affairs of plaintiffs; that their private relations with the corporations named in the subpœnas, and their financial interests therein, can have no bearing upon any proposed legislation; and that the commission is obviously attempting to set itself up as a court or a grand jury rather than a commission to investigate and report upon conditions for the information of the members of the General Assembly. The court below stated, in its opinion, that it was difficult to see the relevancy of many of the matters called for in the subpœnas to a proper legislative inquiry into the transmission of information for gambling purposes, and particularly as concerned plaintiffs' ledgers, journals, check books, cancelled checks, bank deposit books and passbooks. Nevertheless it dissolved the preliminary injunction which it had orig-

inally granted, because it was of the opinion that it could not then determine what evidence might or might not be relevant at some future stage of the hearings before the commission.

It would seem scarcely necessary to marshal authorities to establish, as a proposition of constitutional law, that a witness cannot be compelled, under the guise of a legislative study of conditions bearing upon proposed legislation, to reveal his private and personal affairs, except to the extent to which such disclosure is reasonably required for the general purpose of the inquiry. To compel an individual to produce evidence, under penalties if he refuses, is in effect a search and seizure, and, unless confined to proper limits, violates his constitutional right to immunity in that regard: *Boyd v. U. S.*, 116 U. S. 616, 621, 622. The question in each instance, therefore, is whether the compulsory production of private papers is an *unreasonable* search and seizure within the meaning of the Fourth Amendment of the Federal Constitution or of Article I, section 8 of the State Constitution, and this depends upon the relevancy of the testimony which is sought, for it is uniformly held that a legislative body is not invested with any general power to inquire into private affairs and to compel disclosures but only with such limited right of inquiry as is pertinent to the obtaining of information upon which proposed legislation is to be based. None of the rights of the individual citizen has been more eloquently depicted and defended in the decisions of the Supreme Court of the United States than the right of personal privacy as against unlimited and unreasonable legislative or other governmental investigations. Reference need be made only to such notable opinions as those delivered by that Court in *Kilbourn v. Thompson*, 103 U. S. 168, 190; *Interstate Commerce Commission v. Brimson*, 154 U. S. 447, 478, 479; *Ellis v. Interstate Commerce Commission*, 237 U. S. 434, 445; *Federal Trade Commission v. American Tobacco Co.*, 264 U. S. 298, 305, 306; *McGrain v.*

*Daugherty,* 273 U. S. 135, 173-6; *Jones v. Securities & Exchange Commission,* 298 U. S. 1, 25-28. See also *In re Application of the Pacific Railway Commission,* 32 Fed. Rep. 241, 250-54; *Attorney General v. Brissenden,* 271 Mass. 172, 171 N. E. 82; *Carlisle v. Bennett,* 268 N. Y. 212, 197 N. E. 220. In the *Brissenden* case it was said by Chief Justice RUGG: "In conducting any investigation, whether by a committee of its members or through other agency, the General Court is bound to observe all provisions of the Constitution designed to protect the individual in the enjoyment of life, liberty and property and from inquisitions into private affairs."

While the act under consideration in the present case seems to recognize this fundamental principle, since it authorizes the issue only of such subpœnas as require answers to questions "touching matters properly being inquired into by the commission" and the compulsory production only of such books, papers, records and documents as relate "to the subject of inquiry," we are in accord with the observations made by the court below as to the irrelevance of information called for in the subpœnas issued to these plaintiffs; it follows that there is a constitutional lack of power in the commission to demand it.

The subpœnas show on their face that they contemplate an unreasonable search and seizure. They violate the principle which we announced in *American Car & Foundry Co. v. Alexandria Water Co.,* 221 Pa. 529, where we held that a subpœna duces tecum could not properly be issued to bring in a mass of books and papers in order that there might be a search through them to gather evidence. We, therefore, are of opinion that the subpœnas as issued commanding plaintiffs to produce before the commission the things therein set forth are void in that they do not show that the demands therein are germane to the inquiry authorized by the Governor's call. If the subpœnas were complete in that

regard, a different question might be presented. The plaintiffs are not compelled to produce them.

We cannot agree with the conclusions of the court below that these proceedings have been prematurely brought and that the time for the plaintiffs to raise their objections to the subpœna is when questions are propounded to them or documents demanded at the hearing. Under our system of constitutional government it has become established that equity will restrain public officers from acting pursuant to legislation found to be unconstitutional and that relief will be granted on the application of one whose rights are injuriously affected; the cases on this subject are numerous.

The important question is, where and how may a person served with a demand, such as appears in the record, assert the right? The parties from whom an illegal demand for documents has been made "are not required" as we said in *Brown v. Brancato,* 321 Pa. 54, 61, "to test the alleged right of such person by forcibly resisting his unlawful efforts to seize the books and records of their administration, or, for defiance of the committee's subpœnas, by subsequently justifying their resistance in proceedings for contempt or in habeas corpus (cf. *Ex Parte Caldwell,* 61 W. Va. 49, 55 S. E. 910; *McGrain v. Daugherty,* 273 U. S. 135) or by suffering themselves to be indicted (cf. *Com. v. Costello,* 21 D. R. 232). Equity has jurisdiction to restrain if the committee is without lawful authority in the premises: *Martin v. Baldy,* 249 Pa. 253, 94 A. 1091; *Germantown Trust Co. v. Powell,* 260 Pa. 181, 103 A. 596; *P. R. R. Co. v. Ewing,* 241 Pa. 581, 88 A. 774; *Reeser v. Reeser,* 8 Sadler 78, 5 A. 445."

A difference is to be noted between an unlawful demand contained in a subpœna duces tecum in cases pending in court (as in *American Car & Foundry Co. v. Alexandria Water Co.,* supra), and a demand made by a nonjudicial body. In court parties and witnesses may, by appropriate application made in the proceeding, have their rights determined and preserved, but pro-

ceedings before a nonjudicial body are in a different class. Parties aggrieved in such proceedings must also have opportunity for judicial hearing if their rights are to be determined and preserved. Here, as before stated, the demands for the production of documents show on their face that they violate plaintiffs' constitutional rights; this being so, plaintiffs are entitled now to challenge them and to have them abated and set aside, which is accordingly done.

The order of the court below will be modified by this opinion and as modified is affirmed; costs to be paid by appellants.

SUPPLEMENTAL OPINION BY MR. JUSTICE STERN:

I am in accord with what is said in the opinion of the court as to the constitutionality of Act No. 27 of the special session, and also as to the lack of power of a legislative commission to compel the disclosure by a witness of his private and personal affairs except in so far as such disclosure is reasonably pertinent to the general inquiry. I cannot assent, however, to the proposition that this court has the right to strike down the subpœnas duces tecum as being void on their face. They may seem to call for unjustified information, but, as the court below pointed out, it cannot be judicially determined in advance whether evidence will be relevant or not, but only after one knows the state of the record or of the inquiry at the time it is sought to present it. I think, therefore, that the court below was right in dismissing plaintiffs' bills in equity. I know of no authoritative precedent for the filing of such a bill to restrain, in advance, the enforcement of a subpœna duces tecum upon the ground that the information contained in the documents subpœnaed will not be relevant to the matter under investigation. It is true that in *American Car & Foundry Co. v. Alexandria Water Co.*, 221 Pa. 529, such relief was granted on a petition alleging that it would put the person subpœnaed to great trouble and

expense to produce all the books and papers called for, that there would be needed a very large number of boxes to transport them, and that they would be exposed to destruction. Plaintiffs here, however, do not base their contention upon any such apprehended expense or damage, but only upon the allegation that the documentary evidence called for is irrelevant. Under such circumstances the proper course for them to pursue is to wait until questions are actually propounded to them, or documents demanded at the hearing, which, if insisted upon, would violate their constitutional rights; the courts will then be opened to them for protection: *Eckstein's Petition,* 148 Pa. 509, 516, 517; *Commonwealth v. Klein,* 40 Pa. Superior Ct. 352, 359, 360. Indeed, in view of the general principle that equitable relief can be granted only where property rights are violated, I believe it to be highly questionable whether, in any event, a bill in equity lies in such a case. The Act of June 16, 1836, P. L. 784, section 13 (extended by the Act of February 14, 1857, P. L. 39) grants to courts of Common Pleas only the power of *courts of chancery* to restrain acts prejudicial to the rights of individuals, and equitable relief has therefore generally been refused unless property rights were involved: *Kearns v. Howley,* 188 Pa. 116, 120, 121; *Ashinsky v. Levenson,* 256 Pa. 14, 19; *Hutchinson v. Goshorn,* 256 Pa. 69, 71; *Kenneck v. Pennock,* 305 Pa. 288; *Heasley v. Operative Plasterers & Cement Finishers International Association,* 324 Pa. 257, 259; see, in general, Bispham's Principles of Equity, 11th ed., p. 377.

I express these personal views only because I believe that the questions discussed, while apparently concerned merely with practice, really involve legal principles of far-reaching importance.